# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

**NO. 03-03-00702-CV**

---

**In the Matter of K. K. D.**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT**
**NO. J-23,402, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

K.K.D., a juvenile, was adjudicated delinquent for raping the nine-year-old daughter of his father's girlfriend. He appeals the trial court's assessment of a forty-year determinate sentence in the Texas Youth Commission (TYC), claiming that the evidence is legally and factually insufficient to support the court's finding that "reasonable efforts" had been made to prevent the need to remove him from his home. Because we find the evidence legally and factually sufficient, and because the trial court did not abuse its discretion, we affirm the order of disposition.

## BACKGROUND

Fourteen-year-old K.K.D. was accused in a multi-paragraph petition of engaging in delinquent conduct by committing two counts of aggravated sexual assault and two counts of indecency with a child by contact. *See* Tex. Pen. Code Ann. §§ 22.021, 21.11(a)(1) (West 2003 &

Supp. 2004). He entered a plea of true to paragraph III of the petition, which alleged the offense of aggravated sexual assault against the nine-year-old daughter of his father's girlfriend at their shared home on May 8, 2003. During his adjudication hearing on June 26, 2003, K.K.D. admitted to raping the girl. The trial court found that K.K.D. had engaged in delinquent conduct.

On July 23, the trial court held a disposition hearing. The nurse who examined the nine-year-old victim shortly after the alleged offense testified that, as a result of the rape, the girl suffered a three centimeter tear to the tissue of her labia and perineum that required suturing and was very painful. The girl also had bruising and abrasions around her vagina and bruising on her head around her ears. Detectives found blood from the girl's injuries throughout the home and on her clothing. The trial court took judicial notice of the girl's medical records and admitted photographs of her injuries.

Sarah Cortez, a licensed professional counselor and registered sex-offender treatment provider, testified that she performed an assessment on K.K.D. to determine his supervision needs. Cortez testified that although K.K.D. admitted committing the offense, he did not take full responsibility for it but instead blamed the victim, saying she wanted him to do it. Cortez noted there was a complete inconsistency between K.K.D.'s version of the event and the victim's. Although the evidence showed the offense to have been violent and to have caused the victim severe physical injury, K.K.D. insisted that he did not realize she was in pain. Cortez described K.K.D. as being very suspicious of her and theorized that this suspicion would carry over to the treatment setting, and thus he would not do well in treatment. Cortez described K.K.D. as "concealing" the details of the offense, rather than merely "minimizing" the event. She noted that K.K.D.'s history shows a potential for inflicting violence against women.

Cortez concluded that K.K.D. was at high risk for re-offending in foster care or a minimum security setting such as a residential treatment center. She recommended that he be placed at the TYC "for as long as the law would allow" and receive treatment there. She based this recommendation on the age of the victim, the level of violence, the physical damage inflicted on the child, and the results of her assessment of K.K.D., including his concealment of evidence and failure to take responsibility for his actions. She described K.K.D. as a "power rapist." She stated that it would take at least a year of treatment for K.K.D. to "break through" the very first step of recovery, which is to overcome denial and accept that he intended to commit the offense. Cortez stated that K.K.D. needs anger-management treatment and a sex-offender treatment program with twenty-four-hour supervision.

K.K.D.'s probation officer, Emilio Perez, testified that at the time of the disposition hearing, both of K.K.D.'s parents were incarcerated. At the time of the offense, K.K.D. had been living with his father, the father's girlfriend, and the victim in Leander for about five months. Before that, and for most of his life, he had been living with his grandmother in Del Valle. At the time of the hearing, his grandmother was on a three-year probation for manufacturing and delivering cocaine, and she had been convicted of gambling in 1979, serving a two-year probation for that offense. Perez testified that if K.K.D. were given outpatient sex-offender treatment, he would have to live with a relative and that he would not recommend that K.K.D. be placed with either parent or the grandmother. The probation officer testified that an inpatient residential treatment center would also not be appropriate because the Travis County Juvenile Probation Department (the Department) did not know where K.K.D. would go for aftercare and which family members, if any, would be participating in the family portion of the treatment plan.

3

Records from child protective services (CPS) showed a long history of involvement of that agency with K.K.D.'s family and much documented abuse. For instance, K.K.D.'s grandmother had been referred to CPS on several occasions for neglectful care and supervision of K.K.D.'s siblings and using crack cocaine "on a daily basis." According to CPS records, the grandmother sent K.K.D. to live with his father about five months before the offense because "she could no longer handle his behaviors." K.K.D.'s mother and father had been referred to CPS for abuse of their children, as well as for drug use and neglectful supervision. Perez's court report indicated that the following treatment options for K.K.D. were considered by the Department: (1) outpatient sex-offender treatment, if accepted; (2) placement at a residential treatment center (although K.K.D. was deemed an appropriate candidate for such placement, funding was not available, and placement had not yet been approved); and (3) sex-offender treatment at the TYC.

K.K.D.'s psychologist, John King, testified that he believed K.K.D. should be sent to a "treatment program not unlike Pegasus's treatment program for sexual offenders." He described the Pegasus program as highly structured, with a well-experienced staff that is able to move a youngster though the program and back into the community in about eight to twelve months. Cortez had earlier described residential treatment facilities such as Pegasus as providing twenty-four-hour supervision.

After hearing evidence and reviewing the documentary records, the trial court committed K.K.D. to the TYC for a forty-year determinate sentence. K.K.D. asserts that the evidence was legally and factually insufficient to support the disposition because there was no evidence of "reasonable efforts" taken to prevent the need to remove him from his home. *See* Tex. Fam. Code Ann. § 54.04(i)(1) (West Supp. 2004).

4

**DISCUSSION**

To place a juvenile on probation outside of the juvenile's home or to commit him to the TYC, the court must determine that (1) such placement is in the child's best interests, (2) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return home, and (3) the child, in his home, cannot be provided the quality of care and level of support and supervision that he needs to meet the conditions of probation. *See* Tex. Fam. Code Ann. § 54.04(i)(1). Although the juvenile court's order contains each of these findings, K.K.D. challenges the legal and factual sufficiency of the evidence to support the second required finding—that "reasonable efforts" had been made to prevent the need to remove him from his home. *See id.*

In reviewing factual sufficiency, we consider and weigh all of the evidence, and if the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust, we set aside the disposition order and remand the case for a new disposition hearing. *In re C.C.*, 13 S.W.3d 854, 859 (Tex. App.—Austin 2000, no pet.); *In re K.L.C.*, 972 S.W.2d 203, 206 (Tex. App.—Beaumont 1998, no pet.). In deciding whether the evidence is legally sufficient, we view the evidence in the light most favorable to the finding and determine whether any rational finder of fact could have found the elements of the requirement proven beyond a reasonable doubt. *C.C.*, 13 S.W.3d at 858; *In re M.S.*, 940 S.W.2d 789, 791-92 (Tex. App.—Austin 1997, no pet.). K.K.D. argues that there is no evidence to support the court's finding that reasonable efforts had been made to prevent the removal from his home, and thus the evidence is both legally and factually insufficient.

5

K.K.D.'s points of error each require us to focus on his home, which, unfortunately, did not present an acceptable placement for him. His parents were both incarcerated at the time of the disposition hearing, evidence demonstrated a family history of abuse, and his grandmother was on probation for a drug offense and could no longer "handle him," having already sent him away to live with his father. Moreover, K.K.D.'s "home" was unacceptable based on the testimony of both the State's and K.K.D.'s witnesses, who noted that K.K.D. was in need of a twenty-four-hour residential program, at least as restrictive as Pegasus, and which would necessarily require that K.K.D. be removed from his home. The home environment might be appropriate when a juvenile has been convicted of a non-violent offense and a parent or guardian is present and able to supervise the child, but it is not appropriate when the juvenile has committed a violent offense against a household member, neither parent is physically present due to being incarcerated, and the only other "home" the child has ever known has already relinquished control. The evidence also sufficiently supports the finding that K.K.D.'s home environment—be it with his absent parents or his grandmother—cannot provide him with the level of support and supervision that he needs to meet the conditions of probation or comply with a treatment program. According to Perez's report, the grandmother lacked control over K.K.D.

Importantly, we note that the statute requires the Department to make *reasonable* efforts to prevent the need to remove the child from the home. *See* Tex. Fam. Code Ann. § 54.04(i)(1). Under these circumstances, there were few, if any, efforts that would have been reasonable. Perez's report indicated that the Department had considered the available options for K.K.D. The Department and the court concluded that commitment to TYC was the most reasonable outcome on these facts.

6

K.K.D. attempts to analogize this case to *In re K.L.C.*, in which the Beaumont Court of Appeals reversed a disposition order because there was no evidence introduced of any effort to find an alternative to sending the youth to the TYC. 972 S.W.2d at 206-07; *see also In re A.S.*, 954 S.W.2d 855, 862-63 (Tex. App.—El Paso 1997, no writ) (error to commit juvenile to TYC when record contained no evidence that reasonable efforts had been made and when great weight and preponderance of evidence showed that juvenile's home could provide him with support and supervision necessary to meet probation conditions). However, *K.L.C.* is distinguishable because in response to the question whether the Department had tried to work with the juvenile in an attempt to rehabilitate her, the probation officer responded, "No." Here, there was no specific question posed to any witness about particular efforts the Department made to prevent the need to remove K.K.D. from his home; rather, the evidence supported the trial court's finding because, in light of the testimony of Cortez, Perez, and even King, it was not reasonable to make efforts to keep K.K.D. in his "home," especially when there appeared to be no home, in that both his parents were incarcerated and his grandmother was on probation and had become unable to handle K.K.D. There was uncontroverted testimony that, at a minimum, K.K.D. needs around-the-clock supervision from a residential sex-offender treatment program; in light of such necessity, it would not be reasonable to attempt to place K.K.D. back in his "home," if indeed such home existed. Although in some instances the Department would be required to demonstrate it had attempted to keep the juvenile in his home, this is not such an instance.

K.K.D. also argues that there is no evidence the Department took efforts to find an alternate placement for him with other relatives. However, the family code does not require the Department to investigate every possible alternative to TYC commitment. *See* Tex. Fam. Code Ann.

7

§ 54.04(i)(1); *Echols v. State*, 481 S.W.2d 160, 161-62 (Tex. Civ. App.—Houston [14th Dist.] 1972, no writ). Also, K.K.D.'s trial counsel did not put forward placement with other relatives as a possibility. In fact, his counsel argued that a residential facility was the best option for him, just not the TYC but a facility such as Pegasus. There is no evidence in the record that would have necessitated the trial court exploring placement with alternate relatives. Accordingly, considering the violent nature and gravity of K.K.D.'s conduct and all the evidence, we conclude the evidence was not factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *See In re M.A.C.*, 999 S.W.2d 442, 448 (Tex. App.—El Paso 1999, no pet.) (evidence showing parents' lack of control over juvenile and juvenile's failure to qualify for only other available alternative to TYC was factually sufficient to support finding that reasonable efforts had been made to prevent juvenile's removal from home). We overrule K.K.D.'s second point of error. Likewise, there is legally sufficient evidence to support the disposition, and we thus overrule K.K.D.'s third point of error.

Once the juvenile court has properly made the findings required by section 54.04 of the family code, its discretion to determine disposition attaches. *C.C.*, 13 S.W.3d at 859. "[T]he juvenile court possesses broad discretion to determine a suitable disposition of a child adjudicated delinquent." *In re J.R.*, 907 S.W.2d 107, 110 (Tex. App.—Austin 1995, no writ). Absent an abuse of discretion, we will not disturb a juvenile court's findings. *C.C.*, 13 S.W.3d at 859; *see M.S.*, 940 S.W.2d at 791. A trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *See Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). This Court may not reverse for abuse of discretion merely because we disagree with

8

the decision of the trial court. *See Buller*, 806 S.W.2d at 226; *Downer*, 701 S.W.2d at 242. In light of our determination that the evidence was legally and factually sufficient to support the forty-year determinate sentence, we conclude that the trial court did not abuse its discretion and overrule K.K.D.'s first point of error.

## CONCLUSION

The evidence was legally and factually sufficient to support the trial court's determination that reasonable efforts were made to prevent or eliminate the need to remove K.K.D. from his home, and the trial court therefore did not abuse its discretion in making this finding. We thus affirm the disposition of the juvenile court.

_____

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed

Filed: August 12, 2004

9